

**IT IS SO ORDERED.**
**Signed June 3, 2014**

Arthur S. Weissbrodt
U.S. Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

<div style="margin-left:2em; font-family: monospace;">

In re                 ]   Case No. 13-51106-ASW
                   ]
                   ]   Chapter 13
                   ]
    BRIAN R. HEY and      ]
    PENNY L. HEY,        ]
                   ]   Trial Date: February 18, 2014
          Debtors.    ]
_____ ]

</div>

**MEMORANDUM DECISION GRANTING MOTION TO VALUE COLLATERAL OF THIRD FEDERAL SAVINGS AND LOAN FOR THE PURPOSE OF AVOIDING LIEN**

Before the Court is a motion ("the Motion") by debtors Brian and Penny Hey ("the Debtors") to determine the value and status of the second priority deed of trust held by creditor Third Federal Savings and Loan ("the Creditor") against the Debtors' primary residence located at 2227 Brega Court, Morgan Hill, CA ("the Property"). The Debtors seek a determination that the Creditor's second deed of trust is not secured in any amount, and therefore may be avoided. The Creditor opposes the Motion. The Debtors are represented by attorneys Saman Taherian and Joyce K. Lau of The Fuller Law Firm. The Creditor is represented by Cheryl C. Rouse, of the Law Offices of Rouse & Bahlert.

An evidentiary hearing on the Motion was held on February 18, 2014, and the matter was submitted for decision. As witnesses, the Debtors called Debtor Brian Hey and appraiser Yin Shih, and the Creditor called appraiser Erick Mould.

The Debtors contend that on the date of the bankruptcy petition, the Property's value was $255,000, exactly $5,148.88 less than the $260,148.88 owed to the holder of the first deed of trust. The Creditor contends that the Property's value was $307,000. The Court has considered all of the testimony and evidence presented, and for the reasons set forth below, finds that the Creditor's evidence of the Property's value is not persuasive. By contrast, the Debtors' evidence of value is persuasive.

This Memorandum Decision constitutes the Court's findings of fact and conclusions of law, pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

## I. Findings of Fact

The Debtors commenced this case by filing a petition under chapter 13 of the Bankruptcy Code on February 28, 2013. The Debtors' main asset is the Property, which is a condominium. Two pre-petition deeds of trust were recorded on the Property. The first deed of trust is held by OneWest Bank, and as of the petition date, the amount owing to OneWest Bank was $260,148.88. The second deed of trust is held by the Creditor. The Creditor's proof of claim states that the Creditor's claim is in the amount of $48,755.33. The proof of claim also states that the Creditor's claim is secured by the Property, but the proof of claim does not state a dollar value for the Property.

### A. Testimony of Brian Hey

The first witness to testify was Debtor Brian Hey. Mr. Hey testified as to the Debtors' decision to buy a condominium and not a townhouse in the subject property complex. Mr. Hey testified that when the Debtors purchased the Property in 2001, there were condominiums and townhouses available in the subject property complex. Mr. Hey stated that the Debtors chose to purchase a condominium because of the difference in price between the condominiums and townhouses. To the best of Mr. Hey's knowledge, townhouses in the complex were being sold at $80,000 to $100,000 more than the condominiums.

Mr. Hey further testified about the significant differences between condominiums and townhouses in the complex. Mr. Hey stated that condominium ownership at the complex includes the air space within the condominium, but not any land. By contrast, owners of townhouses also own the land attached to the townhouse, including a backyard. Mr. Hey testified that townhouses in the complex have garages with direct access to the house where the owners can park two cars side by side at once, as well as an attached driveway where an additional two cars may be parked. In contrast, all condominiums in the complex have a two-car tandem garage where the owners can only park one car behind another, with no attached driveway and no access to the house from the garage area. Mr. Hey testified that all condominiums in the complex have neighbors situated directly above or below, whereas a townhouse in the same complex has no neighbors directly above or below.

After this Motion was filed, both sides hired appraisers to evaluate the Property. Mr. Hey testified that Mr. Hey was present

at both appraisals, and that the home was in a "messy" state during both appraisals.[1]  Additionally, Mr. Hey stated that the Property had some damage to the interior walls as well as "basic damage" at the time of both appraisals, and that Mr. Hey alerted each appraiser to the damaged areas.  Mr. Hey stated that the Property was in a similar condition on the petition date as on the dates of both appraisals.

**B. Testimony and Reports of the Appraisers**

Each party offered testimony from an appraiser to state an opinion as to the value of the Property at the time of the Debtors' bankruptcy petition.  Appraiser Yin Shih testified on behalf of the Debtors, and appraiser Erick Mould testified on behalf of the Creditor.  The parties stipulated that both appraisers were qualified experts.  Both experts prepared written reports, which were entered into evidence.  However, the two experts considered different data and offered widely different values for the Property, as discussed below.

**1. Testimony and Report of Yin Shih**

Mr. Yin Shih, who prepared an appraisal on behalf of the Debtors, has not always worked as an appraiser.  Mr. Shih obtained an undergraduate degree in electrical engineering from the California Institute of Technology in 1979, and obtained a masters degree in computer science from the California Institute of

---

[1] Photographs of the property were included with both appraisals.  These photographs demonstrated substantial disarray and clutter within the property at the time of each appraisal, with objects and papers strewn about the rooms, a kitchen sink overflowing with dishes, and a dishwasher door left open.

Technology in 1982. Mr. Shih worked for 20 to 25 years in the field of electrical design engineering and management. Mr. Shih began working for a company called Megatest before moving to Hewlett-Packard. Mr. Shih later began his own company called Symult Systems, which developed high performance computers for scientific computation. From 1990 to 1993, Mr. Shih worked for Kodak Data Tape, which created high speed data recorders for customers such as the military. Starting in 1993 until 1999, Mr. Shih was a partner in Cheshire Engineering, which was an engineering consulting firm. In 1999, Mr. Shih went to work for Quantum, a hard disk storage company. Sometime around 2002, Quantum was acquired by Maxtor and Mr. Shih became the executive of the external storage division. Mr. Shih worked for Maxtor up to his retirement in 2004. In addition to having worked in the engineering field, Mr. Shih also passed the chartered financial analyst level 1 exam.

In 2007, Mr. Shih became interested in real estate and took some courses. Mr. Shih then obtained an appraisal training license and a broker license in 2007. Mr. Shih practiced as a training appraiser from 2007 to 2009. In 2009, Mr. Shih obtained a residential appraiser license. In 2011, Mr. Shih received a certified general appraiser license, which is the fourth and highest level of appraisal license obtainable in California. Mr. Shih is also a candidate for Member of the Appraisal Institute ("MAI") and is about halfway through the process. Mr. Shih has also been designated a collateral valuation report ("CVR") specialist, indicating a level of expertise related to appraisals done with statistical analysis. The CVR specialist designation was

issued by Appraisal World, a private company that produces statistical appraisal reports.  Additionally, Mr. Shih has been a guest lecturer on the topic of real estate appraising at West Valley College.

Mr. Shih estimated that Mr. Shih has performed roughly 400 appraisals since 2007, predominantly in the Santa Clara County area,[2] with 50% in the residential market and 50% in the commercial market.  From 2007 to 2012, Mr. Shih worked for George Miller Associates under the direct supervision of George Miller. Beginning in 2010, Mr. Shih started his own appraisal company, Koya Associates.  Mr. Shih stated that from 2010 to 2012, Mr. Shih worked at both companies, completing on average 50 appraisals per year for each company.

Mr. Shih evaluated the fair market value of the Property as of the petition date, February 28, 2013.  Mr. Shih concluded that the fair market value of the Property was $255,000.00 on that date -- only $5,148.88 less than the amount owed on the first deed of trust.  Mr. Shih based that conclusion upon a sales comparison analysis of nine comparable properties, all of which are condominiums located in the same complex as the Property.  Mr. Shih's report shows that two of the comparable properties were bank-owned properties, six were short sales, and one property was a conventional sale.  Of these, five were 1,104 square feet, two-bedroom condominiums with two bathrooms; the other four were 1,453 square feet, three-bedroom condominiums with 2 bathrooms.  The Debtors' Property is a 1,453 square feet, three-bedroom condominium

---

[2] Mr. Shih estimated that about 80% of Mr. Shih's appraisals have been in Santa Clara County, and fewer than 5 appraisals have been in Morgan Hill.

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

with two bathrooms.  Per Mr. Shih's report, the sale prices of Mr. Shih's comparables ranged from $220,000.00 to $305,000.00, and were sold between March 9, 2012 and March 18, 2013.

Although the complex where the Property is located also had townhomes, Mr. Shih did not use any townhomes as comparables.  Mr. Shih testified that in this instance, Mr. Shih preferred to use only condominiums as comparables, because the townhomes were too dissimilar and an adjusted value would be difficult to quantify. Mr. Shih explained that while it is usually desirable when conducting an appraisal to include smaller and larger properties for comparison in a process called "bracketing," it was not necessary to use larger comparables in this case.

Mr. Shih stated that short sales were the predominant form of sale within the complex in 2012.  According to Mr. Shih, based on the Property's condition, as well as the available properties in the subject complex during the year before the petition, the Property was similar to distressed sales that comprised the majority of the market in 2012.

Mr. Shih testified that he saw many defects with the Property during his inspection, including the following: there were two or more windows with broken seals, causing internal fogging between the panes; many areas contained exposed drywall due to plaster being chipped or stripped; there was substantial writing with marker or crayon on the walls and doors; there were holes in at least one door and one wall; there was a broken bi-fold door; there were several broken and bent window screens; there were stains and lime deposits in the bathroom and kitchen sinks; there were ceiling stains due to water leakage from the unit above; a section of

drywall had been removed from the garage ceiling resulting from water leakage from the unit above; and there was evidence of termites and/or rot on the balcony railing.

Because of these defects, which Mr. Shih also referred to as "deferred maintenance," Mr. Shih made a negative adjustment of $10,000 to all nine of the comparable properties. This $10,000 figure was an estimate for the cost to repair the defects, but Mr. Shih stated that for a more accurate estimate, a general contractor would need to be consulted. Mr. Shih explained that Mr. Shih selected the $10,000 number because, in Mr. Shih's opinion, a buyer would offer $10,000 less for the Property after assessing the Property's defects. In determining whether a negative adjustment of $10,000 was warranted for each comparable, Mr. Shih examined the MLS listings to look for clues about the interior condition of each property, such as whether the comparables were "fixer-uppers." According to Mr. Shih, there were no such clues for any of the comparables.

Mr. Shih acknowledged that the Property was messy and cluttered when Mr. Shih came to appraise it. Mr Shih thought, perhaps, that the mess was deliberate for the purpose of making the Property "look a little worse" to influence the appraisal. However, according to Mr. Shih, the mess did not influence Mr. Shih's appraisal.

For all comparables used in Mr. Shih's report, except for comparable #6, Mr. Shih made a positive adjustment of $5,100, because the subject Property has an additional storage room measuring 204 square feet, accessible from the garage. Only ground floor, three-bedroom units have such storage rooms. Mr. Shih did

not make this adjustment for comparable #6, which appeared to have a similar storage room given comparable #6's ground floor location. Mr. Shih calculated this $5,100 adjustment by assigning a $25 per square foot value to the storage space. Mr. Shih stated that this value was appropriate based on the estimated cost of construction to create such a room.

Mr. Shih also made adjustments for age; if the comparable was newer than the Property, then Mr. Shih made a negative adjustment. Mr. Shih determined that a 0.25% per year reduction in value was appropriate to account for the respective age of the properties. Mr. Shih derived this percentage from research and a linear regression analysis conducted by Mr. Shih in 2012, whereby Mr. Shih analyzed thousands of properties sold throughout Santa Clara County. Mr. Shih had conducted the research to find appropriate adjustments for properties based on different characteristics, including age. Mr. Shih stated that his analysis was consistent with the statistical analysis being used in appraisal courses.

Mr. Shih also made a $28,000 positive adjustment to the two-bedroom condominiums to account for the difference in size. To calculate this adjustment, Mr. Shih looked at all condominiums sold in the complex from February 2012 to February 2013. Mr. Shih found that the price per square foot for all comparable properties remained level during that time period, and thus concluded that no time adjustment was needed. Mr. Shih determined that the three-bedroom condominiums in the complex sold for an average of $173 per square foot, while the two-bedroom condominiums sold for an average of $202 per square foot. Mr. Shih then took the average sale price of three-bedroom condominiums ($251,369), and subtracted that from

the average sale price of two-bedroom condominiums ($223,008), in order to come to a difference in sale price between the two types of condominiums of $28,361. Mr. Shih rounded that figure to $28,000, which Mr. Shih used as a positive adjustment for the two-bedroom condominiums.

Mr. Shih conceded that if Mr. Shih had used a traditional approach of assigning a standard $100 per square foot positive adjustment, then the adjustment would have been $7,000 higher, at $35,000. However, Mr. Shih thought that an adjustment of $28,000 was more accurate in light of the available data.

Comparable #1 was the smaller, 1,104 square foot, two-bedroom condominimum. Comparable #1 was sold in a short sale for $240,000 on March 18, 2013, and Mr. Shih calculated an adjusted sale price of $261,300 for comparable #1. Mr. Shih made a positive adjustment of $28,000 to account for the difference in square footage between comparable #1 and the Property, and a positive adjustment of $5,100 to account for additional storage space at the Property. As with all of the comparables, Mr. Shih negatively adjusted the price by $10,000 to account for damage to the Property. Mr. Shih also made a negative adjustment of $1,800, because the Property was three years older than comparable #1.[3]

Comparable #2 was also the smaller, 1,104 square foot, two-bedroom condominium. Comparable #2 was sold during a conventional sale for a price of $305,000 on March 12, 2013. Mr. Shih calculated an adjusted sale price of $314,772 for comparable #2, after making a negative adjustment of $10,000 for deferred

---

[3] In questioning Mr. Shih, counsel referred to this adjustment as a $1,600 adjustment, but the appraisal report shows that the adjustment was actually in the amount of $1,800.

maintenance, a negative adjustment of $11,040 to account for the superior condition of comparable #2,[4] and a $2,288 negative adjustment for age. Mr. Shih made the standard positive adjustments of $28,000 for size, and $5,100 for the storage space.

Comparable #3 was the same size as the Property and sold for $250,000 on December 27, 2012, in a short sale. For comparable #3, Mr. Shih made the standard negative adjustment of $10,000, and a positive adjustment of $5,100 for the storage space, ultimately calculating an adjusted sale price of $245,100.

Comparable #4 was the smaller unit, and sold for $220,000 at a short sale on September 26, 2012. Mr. Shih calculated the adjusted sale price of comparable #4 as $241,450, after taking into account the standard positive adjustments of $28,000 and $5,100, and negative adjustments of $1,650 for age, along with the standard negative adjustment of $10,000.

Comparable #5 was also the smaller unit, and it sold for $240,000 on September 6, 2012, in an REO sale. Mr. Shih calculated the adjusted sale price of comparable #5 as $255,780. Positive adjustments included the typical $28,000 and $5,100 adjustments. Negative adjustments were in the amounts of $1,800 for age, $5,520 for comparable #5's superior condition,[5] and the standard $10,000 for damage to the Property.

Comparable #6 was the same size as the Property and also had a storage room. Comparable #6 sold for $230,000 at a short sale on

---

[4] Mr. Shih's information about the superior nature of comparable #2 came from an MLS listing, which stated that comparable #2 had hardwood floors and stainless steel appliances.

[5] Mr. Shih explained that per the MLS listing for comparable #5, comparable #5 had new bathroom floors and appliances.

August 31, 2012.  Mr. Shih calculated the adjusted sale price of comparable #6 as $218,275.  In doing so, Mr. Shih made the standard negative adjustment of $10,000, but made an additional negative adjustment of $1,725 to account for the age difference.

Comparable #7 was the same size as the Property, but lacked the storage space.  Comparable #7 sold for $261,000 on July 15, 2012, during a short sale.  Mr. Shih adjusted the price of comparable #7 as follows: a positive adjustment of $5,100 for a lack of storage; a negative adjustment of $1,958 for age; the standard negative adjustment of $10,000; and an additional negative adjustment of $7,265 for the superior condition of comparable #7.[6] This resulted in an adjusted sale price of $246,877.

Like comparable #7, comparable #8 was also the same size as the Property, and also lacked the storage space.  Comparable #8 sold for $255,000 during a short sale on April 18, 2012.  Mr. Shih adjusted the price of comparable #8 with the standard negative adjustment of $10,000, and the standard positive adjustment of $5,100.  Mr. Shih also gave negative adjustments of $1,913 for age, and $14,530 based on comparable #8's superior condition in light of a fully remodeled kitchen.  The adjusted sale price for comparable #8 was $233,657.

Comparable #9 was also the same size as the Property. Comparable #9 sold for $260,000 in an REO sale on March 9, 2012, but Mr. Shih assigned it an adjusted sale price of $240,570.  Mr. Shih made the standard positive adjustment of $5,100 for the lack of a storage room, and the standard negative adjustment of $10,000.

---

[6] According to Mr. Shih, comparable #7 was superior because the MLS listing showed that comparable #7 had new doors, mirrored closets, and ceiling fans.

In addition, Mr. Shih made a negative adjustment of $14,530 because comparable #9 was in superior condition.[7]

To summarize, the following chart shows Mr. Shih's calculation of the adjusted sale price for each comparable:

| Comp. | Sale Price | Sale Date | Storage | Age | Condition | Size | Other (Property Damage) | Adjusted Sale Price |
|---|---|---|---|---|---|---|---|---|
| 1 | 240,000 | 3/18/2013 | +5,100 | -1,800 | none | +28,000 | -10,000 | 261,300 |
| 2 | 305,000 | 3/12/2013 | +5,100 | -2,288 | -11,040 | +28,000 | -10,000 | 314,772 |
| 3 | 250,000 | 12/27/2012 | +5,100 | none | none | none | -10,000 | 245,100 |
| 4 | 220,000 | 9/26/2012 | +5,100 | -1,650 | none | +28,000 | -10,000 | 241,450 |
| 5 | 240,000 | 9/6/2012 | +5,100 | -1,800 | -5,520 | +28,000 | -10,000 | 255,780 |
| 6 | 230,000 | 8/31/2012 | none | -1,725 | none | none | -10,000 | 218,275 |
| 7 | 261,000 | 7/15/2012 | +5,100 | -1,958 | -7,265 | none | -10,000 | 246,877 |
| 8 | 255,000 | 4/18/2012 | +5,100 | -1,913 | -14,530 | none | -10,000 | 233,657 |
| 9 | 260,000 | 3/9/2012 | +5,100 | none | -14,530 | none | -10,000 | 240,570 |

Mr. Shih testified about Erick Mould's analysis of Mr. Shih's comparable #7, which was also Mr. Mould's comparable #3. Mr. Mould added a positive $37,000 time adjustment to that comparable to account for the passage of time between the sale of the comparable and the petition date, with an adjusted sale price of $298,000 -- almost $53,000 more than the adjusted sale price obtained by Mr. Shih. Mr. Shih stated that Mr. Shih might have made that adjustment initially, but after analyzing the data pertaining to actual sales in the complex, did not think that the $37,000 time adjustment was reasonable under the circumstances because prices had remained level for a long time. Mr. Shih explained that the

---

[7] Mr. Shih made this adjustment because comparable #9 was listed in the MLS as having granite counter tops in the kitchen and bathroom, maple cabinets, cherry wood floors, and a slate fireplace.

1  sale price on the date of closing is actually set approximately a

2  month or more prior to closing when parties to the sale enter into

3  a contract.  Mr. Shih acknowledged that Mr. Shih's comparable #2,

4  which closed escrow in March 2013, gave some indication that prices

5  in the complex might rise.

6

7  **2. Testimony of Erick Mould**

8       Mr. Erick Mould is an owner and principal appraiser for

9  Pacific Residential Appraisal Services.  Mr. Mould has been a

10  licensed appraiser in the State of California since 2004.  Mr.

11  Mould briefly attended Cabrillo Junior College, without graduating,

12  before starting work in the appraisal field.  Starting in 1991, Mr.

13  Mould worked under the guidance of David Kassler before purchasing

14  Mr. Kassler's appraisal company around 2005.  Mr. Mould stated that

15  Mr. Mould worked on and off in the appraisal field between 1991 and

16  2005, and spent some time traveling and bartending during the

17  1990s.

18       Mr. Mould holds an "AR" certified residential license, but is

19  not MAI certified and is not working towards MAI certification.

20  Mr. Mould's appraisal work is exclusively residential, and Mr.

21  Mould has worked extensively in Santa Clara County.  Mr. Mould

22  stated that Mr. Mould performs an average of 100 to 200 appraisals

23  each year, and estimated that Mr. Mould has written between 40 and

24  50 appraisals in the Morgan Hill area within the last year.

25       Mr. Mould opined that the fair market value of the Property

26  was $307,000 as of February 28, 2013.[8]  Mr. Mould based this

27

28       [8] Originally, Mr. Mould had appraised the Property as of May
   1, 2013, at a value of $308,000, using five comparable properties.
                                                    (continued...)

conclusion upon a sales comparison analysis of three comparable properties from the same neighborhood as the Property. Two of the comparable properties which Mr. Mould used were conventional sales, and one was a short sale. In addition, two were townhomes, and one was a condominium. Mr. Mould explained that the townhomes were used to provide larger units in the analysis, for bracketing purposes.

Comparable #1 was a townhome which sold for $420,000 in August 2012. This townhome was 1,674 square feet, and Mr. Mould made a negative adjustment of $11,000 to account for the larger size, using $50 per square foot based on market data, but without conducting an in-depth statistical analysis. Because the townhome had an additional half bath, Mr. Mould also made another negative adjustment of $5,000, but agreed that this adjustment could have been as much as $10,000. To account for the design difference, Mr. Mould subtracted another $21,000 (5% of the sale price). Mr. Mould also subtracted $41,995 (approximately 10% of the sale price) to account for comparable #1's superior condition, and $10,000 because comparable #1 had a remodeled kitchen. This resulted in an adjusted sale price of $331,005.

Comparable #2 was also a townhome which sold for $340,000 in February 2013. This townhome was also 1,674 square feet, and Mr. Mould again made a negative adjustment of $11,000 due to the size difference. Similarly, a $5,000 negative adjustment was made for an additional half bath. This time, Mr. Mould made only a $17,000

---

[8](...continued)

When asked to value the Property as of the petition date, Mr. Mould removed from the appraisal two comparable properties which had closed in March 2013.

negative adjustment for the design difference (again at 5% of the sale price), but agreed that the adjustment for the townhomes could be higher at 10 to 15% of the sale price, which would be $34,000 to $51,000 with respect to comparable #2. For comparable #2, the adjusted sale price was $307,000.

Comparable #3 was a condominium, and was also used by Mr. Shih as Mr. Shih's comparable property #7. Unlike Mr. Shih, Mr. Mould made a positive adjustment of $37,000 to account for the passage of time (more than 6 months), and made no other adjustments. For comparable #3, Mr. Mould calculated an adjusted sale price of $298,000.

In support of the time adjustment, Mr. Mould stated that the market for similar properties in 2012 was predominantly short sales, whereas beginning in February and March of 2013 the market started to turn towards normal transactions, which caused prices to increase. Mr. Mould stated that a positive time adjustment of $37,000.00 was accurate in light of limited inventory for sale in the Morgan Hill area. This adjustment was based on a 2% per month increase in value.

To summarize, the following chart shows Mr. Mould's calculation of the adjusted sale price for each comparable:

| Comp. | Sale Price | Sale Date | Design | Condition | Half Bath | Size | Other | Adjusted Sale Price |
|-------|-----------|-----------|---------|-----------|-----------|--------|---------|---------------------|
| 1 | 420,000 | 8/2012 | -21,000 | -41,995 | -5,000 | -11,000 | -10,000 | 331,005 |
| 2 | 340,000 | 2/2013 | -17,000 | none | -5,000 | -11,000 | none | 307,000 |
| 3 | 261,000 | 7/2012 | none | none | none | none | +37,000 | 298,000 |

Based on Mr. Mould's testimony, the adjusted sale price could have been much lower for both townhomes. For comparable #1, the adjusted sale price could have been reduced by an additional

$47,000 (an additional $5,000 for the half bath, and $42,000 for the fact that the comparable was a townhome) to $284,005. For comparable #2, the adjusted sale price could have been reduced by an additional $39,000 (an additional $5,000 for the half bath, and $34,000 for the fact that the comparable was a townhome) to $268,000.

Interestingly, Mr. Mould made no adjustments for the condition of the Property. Mr. Mould did not recall that Mr. Hey pointed out any deficiencies with the Property, but Mr. Mould also stated that Mr. Mould had difficulty assessing the Property's condition because it was so cluttered. Mr. Mould agreed that a negative adjustment to the Property's value would be appropriate if the Property were in the condition reported by Mr. Shih, and did not dispute the propriety of the $10,000 adjustment used by Mr. Shih. Applying that adjustment, here, would result in an adjusted sale price of $274,005 to Mr. Mould's comparable #1, and $258,000 for Mr. Mould's comparable #2.

Also of some interest, Mr. Mould was unaware that the Debtors' Property had a storage room. Mr. Mould stated that he would have given that room a value of between $2,000 and $5,000, which might have resulted in a positive adjustment to all three of Mr. Mould's comparables.

On cross-examination, Mr. Mould was asked what adjustments Mr. Mould would make in the situation where there were two properties equivalent in every respect except that only one property had a yard. Mr. Mould stated that Mr. Mould would adjust the value by 5% to 10% for a property with a yard. If the property's only difference was a side-by-side versus a tandem garage, Mr. Mould

stated that a side-by-side garage would add 2% to the value over a tandem garage. Mr. Mould also stated that 5% should be added for a property with no neighbors above or below. Applying these characteristics to the townhomes evaluated by Mr. Mould, this would result in 12% to 17% in adjustments, assuming the properties were equal in all other respects, such as in square footage.

Mr. Mould made one typographical mistake in his appraisal, and admitted as much. In describing the Property's neighborhood in the appraisal, Mr. Mould wrote: "Westfield Oakridge shopping center, Golf Club at Boulder Ridge are both 5 minutes by car." However, Mr. Mould explained that this language was probably from an older appraisal for a different property. Mr. Mould thought that the Property was approximately 30 minutes from the Westfield Oakridge shopping center,[9] and Mr. Mould did not consider the shopping center in his analysis.

## II. Conclusions of Law

The Debtors seek to avoid the Creditor's lien, as wholly unsecured, and have asked the Court to determine the value of the Property. The Debtors contend that the fair market value of the Property on the petition date was $255,000 -- exactly $5,148.88 less than the $260,148.88 owing to the first deed of trust holder. By contrast, the Creditor asserts that the Property had a value of $307,000, and that the Creditor's lien is secured, at least to some extent.

The Motion is brought under 11 U.S.C. § 506(a)(1), which states:

---

[9] Mr. Hey testified to a similar distance.

An allowed claim of a creditor secured by a
lien on property in which the estate has an
interest . . . is a secured claim to the extent
of the value of such creditor's interest in the
estate's interest in such property . . . and is
an unsecured claim to the extent that the value
of such creditor's interest . . . is less than
the amount of such allowed claim.

Initially, the Debtors bear the burden of overcoming any presumption that the value of the Property stated in the Creditor's proof of claim is the correct value. See In re Postolica, No. 10-51522-ASW, 2012 WL 1035900 *5 (Bankr. N.D. Cal. 2012) (citing In re Southmark Storage Associates Ltd. Partnership, 130 B.R. 9, 10 (Bankr. D. Conn. 1991)). Once the Debtors meet this burden, it then becomes the Creditor's burden of persuasion to demonstrate the value of the collateral by a preponderance of the evidence. Id.

The Debtors have met their burden, with ease. This is because the proof of claim filed by the Creditor did not offer a value for the Property. In addition, the Debtors have provided evidence that the Property's value was only $255,000 when the petition was filed. Therefore, the issue is whether the Creditor has met its burden of persuasion.

The parties agree that the Property's value for purposes of this analysis should be fair market value. This is consistent with the applicable precedent. See Associates Commercial Corp. v. Rash, 520 U.S. 953 (1997); Taffi v. United States (In re Taffi), 96 F.3d 1190, 1192 (9th Cir. 1996). Fair market value is "the price which a willing seller under no compulsion to sell and a willing buyer under no compulsion to buy would agree upon after the property has been exposed to the market for a reasonable time." Taffi, 96 F.3d at 1192. However, this Court does not need to determine the exact value of the Property, and instead only needs to determine whether the

Creditor has demonstrated, persuasively, that the value of the Property at the time of the Debtors' bankruptcy petition exceeded $260,148.88. See In re Serda, 395 B.R. 450, 453 (Bankr. E.D. Cal. 2008).

The Creditor has not met its burden, because Mr. Mould's appraisal of the Property was deficient in several respects. Two of the three comparables used by Mr. Mould were townhomes which were vastly different from the Property in numerous ways. The townhomes were not only larger, but the townhomes had yards, side-by-side garages attached to the homes, and no neighbors above or below. Mr. Mould's use of a 5% negative adjustment to account for the difference in value between the townhomes and condominiums was unreasonably low, particularly in light of the unrefuted testimony of Mr. Hey that the townhomes originally sold for $80,000 to $100,000 more than the condominiums. Even Mr. Mould agreed that the adjustment could have been as high as 15%, and that such an adjustment -- combined with an additional $5,000 adjustment for the half bath -- would have brought the adjusted sale price of comparable #2 to within eight thousand dollars of the amount owed by the Debtors on the first deed of trust. This does not account for an upward adjustment which Mr. Mould failed to make for the storage space, which might have been appropriate, but shows a substantial range of potential value for the Property.

Mr. Mould's appraisal was also deficient in that Mr. Mould did not take into account several defects with the Property. Understandably, Mr. Mould had a difficult time appraising the Property given its cluttered state, as evidenced by the photographs attached to Mr. Mould's appraisal. However, Mr. Mould agreed that if the Property were defective in the manner stated by Mr. Shih, then a

1  downward adjustment would be appropriate.  Mr. Mould did not dispute

2  the propriety of a downward adjustment of $10,000 for these problems.

3  For Mr. Mould's comparable #2, and applying Mr. Mould's framework,

4  this could have resulted in an adjusted sale price of $258,000 --

5  less than what the Debtors owed on the first deed of trust.

6      The statistical thoroughness of Mr. Shih's appraisal contrasted

7  sharply with the appraisal by Mr. Mould.  Mr. Mould conceded that Mr.

8  Mould did not perform a statistical analysis in assessing whether a

9  time adjustment would be appropriate, or in what amount, for Mr.

10  Mould's comparable #3.  The Court is not at all convinced that an

11  upward adjustment of $37,000 was appropriate under the circumstances,

12  given that the neighborhood sale market had remained relatively flat

13  for approximately one year.  Certainly, there was some indication

14  that property values began to rise in March 2013, but a willing buyer

15  and a willing seller in February 2013 would not have known about the

16  upcoming market change.  Even Mr. Mould agreed that the market had

17  been flat for quite some time, and offered insufficient justification

18  for the use of a $37,000 adjustment under these circumstances.

19      The Court concludes that no time adjustment was appropriate for

20  Mr. Mould's comparable #3.  This would leave an unadjusted sale price

21  of $261,000 for that property.  Mr. Mould admitted that a negative

22  adjustment was appropriate if there were defects.  Applying Mr.

23  Mould's methodology, this would leave an adjusted sale price of

24  $251,000 for Mr. Mould's comparable #3.

25      Mr. Mould's comparable #1 was also overvalued.  As discussed in

26  the Findings of Fact, _supra_, Mr. Mould's methodology would have

27  justified an adjusted sale price of $284,005, not accounting for the

28

1   Property's defects.  Therefore, the adjusted sale price for Mr.

2   Mould's comparable #1 could have been as low as $274,005.

3       To summarize, based on Mr. Mould's testimony, and assuming no

4   other adjustments were needed, the adjusted sale prices for each of

5   the comparable properties in Mr. Mould's appraisal could have been as

6   low as $274,005 (instead of $331,005) for comparable #1, $258,000

7   (instead of $307,000) for comparable #2, and $251,000 (instead of

8   $298,000) for comparable #3.

9       Although the comparables used by Mr. Shih spanned a much longer

10  period of time in terms of sale dates, the comparables were more

11  appropriate than those selected by Mr. Mould.  Mr. Shih compared five

12  condominiums with the same square footage and approximate

13  configuration as the Debtors' Property, whereas Mr. Mould considered

14  only a single condominium in his analysis.

15      The Creditor has not met its burden to persuade this Court that

16  the value of the Property on the petition date exceeded $260,148.88.

17  Therefore, the Debtors' Motion is granted.

18      **IT IS SO ORDERED**.

19

20                  ** END OF MEMORANDUM DECISION **

21

22

23

24

25

26

27

28

Brian R. Hey
Penny L. Hey
2227 Brega Court
Morgan Hill, CA 95037


Lars Fuller
Joyce Lau
The Fuller Law Firm, P.C.
60 No. Keeble Ave.
San Jose, CA 95126


Cheryl Rouse
Law Offices of Rouse & Bahlert
345 Franklin St.
San Francisco, CA 94102


Raymond F. Moats, III
Weltman, Weinberg & Reis Co., L.P.A.
175 South Third Street, Suite 900
Columbus, OH 43215

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California